ERVIN, Judge,
dissenting.
I would reverse as to all three issues raised and remand the case for new trial.[2] The majority affirms without extended discussion of the first point relating to appellant’s claim of a juror’s concealment of material knowledge. In our prior opinion in Singletary v. Lewis, 584 So.2d 634 (Fla. 1st DCA 1991) (Singletary I), we remanded the case to the trial court for the purpose of a jury interview in order for it to determine, among other things, “the nature and extent of the alleged material concealment.” Id. at 637.
Regarding this issue, the record reflects that at the outset of jury selection, counsel for the plaintiffs generally asked all jurors whether any of them knew Ms. Singletary or her child, and only three of the jurors responded affirmatively, while the remain *356 der, including juror Tuten, replied they did not. The question, like the one posed in Mitchell v. State, 458 So.2d 819 (Fla. 1st DCA 1984), discussed infra, was clear and straightforward, and, in view of Ms. Tu-ten’s negative answer, it should not have been incumbent upon defense counsel to explore the topic further, notwithstanding Ms. Tuten’s later answer during her individual examination, that she knew everyone in the county who had not moved there during the preceding ten years. After this court’s remand, Ms. Tuten admitted that she had known Kathryn Singletary since Singletary was a child, because she had come with her mother to the Tutens’ grocery store.
As this court explained in Mitchell, even when the false information is given by a juror unintentionally, and regardless of a juror’s lack of bad faith, a new trial may be required because the juror’s concealment of a material fact denies to the party affected “the right to make an intelligent judgment as to whether a juror should be excused. Counsel should have the right to truthful information in making that judgment.” Id. at 821. See also Mobil Chem. Co., a Div. of Mobil Corp. v. Hawkins, 440 So.2d 378, 381 (Fla. 1st DCA 1983) (“[The juror’s] failure to disclose material information bearing on her possible bias and her qualifications to serve as a juror deprived Mobil of its right to intelligently participate in selection of the jury, and gives rise to an unacceptedly strong inference that Mobil did not receive the fair trial to which it was entitled.”), review denied, 449 So.2d 264 (Fla.1984).
Thus, even if a trial court finds that a juror had no intent to deceive when he or she answered a question incorrectly,
relief will be afforded where (1) the question propounded is straightforward and not reasonable [sic] susceptible to misinterpretation; (2) the juror gives an untruthful answer; (3) the inquiry concerns material and relevant matter to which counsel may reasonably be expected to give substantial weight in the exercise of his peremptory challenges; (4) there were peremptory challenges remaining which counsel would have exercised at the time the question was asked; and (5) counsel represents that he would have peremptorily excused the juror had the juror truthfully responded.
Mitchell, 458 So.2d at 821 (footnote omitted).
In applying the above rule to the instant case, I can only conclude that as a result of Ms. Tuten’s failure to make a complete and open disclosure of her knowledge of Kathryn Singletary, plaintiffs’ counsel was denied the right to make a reasoned decision as to whether Ms. Tuten should have been excused for cause or preemptorily. Thus, I consider that even if issue I is considered in isolation, the trial court abused its discretion in refusing to grant appellants’ motion for new trial.
Considering issues I and II together, however, I think the justification for granting a new trial is even stronger, and that a substantial inference arises from the record that Ms. Tuten’s failure to make an open and complete disclosure of her knowledge of the Singletary family was intentional, not inadvertent. As recited in this court’s earlier opinion in Singletary I, alternate juror Lumpkin testified that Tuten stated in her presence during the course of the trial that she knew the family; however, the record does not disclose that Tuten reported this fact to the court. When the above comments are coupled with other statements Tuten made during the trial proceedings, a deliberate pattern of malicious intent is displayed.
This court in Singletary I asked the trial court to consider whether a finding of misconduct should be made based upon certain comments alleged to have been made by some jurors which indicated the existence of prejudice against appellants. In our earlier opinion we recounted that alternate juror Lumpkin (an African-American juror) reported that from the very beginning of the eight-day trial, Ms. Tuten (a Caucasian juror) had commented that Ms. Singletary “was a fool for having so many babies”[3] *357 and “they ought to sewed her up.” Ms. Seippio (another African-American juror) also related to Lumpkin a comment Seippio overheard, but Lumpkin did not, that Sin-gletary and her child’s needs would be better satisfied by a receipt of welfare benefits rather than an award of damages. At another point, another juror wondered aloud, in Ms. Lumpkin’s presence, after a local banker appeared in the courtroom during trial, why the banker was there and how he knew that the defendants would prevail, thereby suggesting that the juror had prejudged the case without hearing all the evidence.
After remand of the cause to the trial court for the purpose of conducting an interview, which was held 27 months following the trial, jurors Seippio and Smith corroborated the substance of Lumpkin’s earlier testimony relating that a juror had commented that Kathryn Singletary should have been sewed up in order to avoid becoming pregnant. Although Ms. Seippio did not remember the person who had made the statement, juror Smith identified Tuten as the person who had so spoken, but her version of Tuten’s remarks was different from Lumpkin’s. Smith recalled Tuten as saying that if she had been Sin-gletary, she would have had herself sewed up, rather than having the child. Three jurors could not remember the “sewing up” comment, while juror Tuten denied both making or hearing it.[4] In regard to Lump-kin’s testimony that she was informed by juror Seippio that some of the jurors had indicated they would prefer it if the plaintiffs received welfare rather than an award of damages, this statement was confirmed by five jurors, including Tuten.
After considering the testimony of alternate juror Lumpkin before remand and the six participating jurors following remand, the majority now affirms the trial court’s denial of the motion for new trial and states that because the present case does not involve any explicit racial slur, such as existed in Sanchez v. International Park Condominium Association, 563 So.2d 197 (Fla. 3d DCA 1990), the motion for new trial was correctly denied, and,' even if no specific racial slur is required, it concludes the trial court did not abuse its discretion in so deciding. I cannot agree.
The comments that were directly made in alternate juror Lumpkin’s presence, and corroborated on remand, occurred despite the trial court’s prior specific instructions that the jurors should not form or express any opinion about the case until they had received all the evidence, the arguments of the attorneys, and the instructions on the law from the court. Thus, at the very minimum, the evidence shows a blatant nonconformance by some of the jurors with the court’s instructions and clearly reveals that they — including Tuten — had in fact prejudged the case from practically the very outset of the trial without regard to the evidence. It is a sufficient ground for new trial in itself if the evidence discloses that a juror has, during the progress of the trial, decided the verdict without regard to the evidence that has been or will be presented. 38 FÍa.Jur.2d New Trial § 29, at 255 (1982).
In requiring that there be a direct racial reference in order for the Sanchez rule to apply, the majority, in my judgment, has departed from the law of the case which was established in Singletary I. In this court’s prior recitation of the comments allegedly overheard by Lumpkin, none of the comments reported reflects an explicit racial slur against Ms. Singletary or her child. In fact, this court specifically stated that Lumpkin testified that none of the remaining white jurors made any racial remarks in front of her and Seippio. Single-tary I, 584 So.2d at 636. Notwithstanding the absence of such explicit comments, this court decided that, based on the statements made, the appellants had met their burden *358 of establishing a legally sufficient reason for requiring a jury interview. We continued that “[prejudice against one of the parties or the making of prejudicial comments in the presence of the jury is evidence of improper considerations.” Id. at 637. We remanded the case for a jury interview to permit the trial court to make an “initial factual determination as to whether the evidence supports a finding of misconduct on the part of the jury.” Id. We made no demand of proof of an explicit racial slur as a precondition to a finding of jury misconduct. Although this court did not decide any issue regarding the existence of misconduct, the clear import of our language reveals that we had already decided that the “sewing up” comment would, if corroborated, be legally sufficient evidence of prejudicial misconduct, regardless of whether the remark made any specific reference to African-Americans.
Moreover, it is immaterial whether this court in Singletary I was correct in deciding that a legal basis for a jury interview existed, based upon the comments Lumpkin reported. The general rule is that “whatever is once established between the same parties in the same case continues to be the law of the case, whether correct on general principles or not, so long as the facts on which such decision was predicated continue to be the facts in the case.” 3 Fla. Jur.2d Appellate Review § 414, at 566 (1978) (emphasis added) (footnote omitted). Another applicable rule involving the law of the case is that “additional evidence merely cumulative to evidence of the same class received at the first trial and considered on the first appeal does not interfere with the doctrine of the law of the case.” 3 Fla.Jur.2d Appellate Review § 419, at 574 (emphasis added) (footnote omitted).
Therefore, once this court in Singletary I determined that a sufficient legal ground had been established for conducting a jury interview, based upon the character of the comments alleged, neither the trial court nor the majority in the present case was authorized, under the law of the case, to revisit that determination. In determining whether jury misconduct occurred, the lower court’s primary responsibility on remand was to decide whether sufficient evidence corroborated the alleged prejudicial statements reported by Lumpkin. In making its decision, the court should have confined its inquiries to the objective evidence regarding the comments and should not have delved into questions — as it did — regarding whether the comments had any effect on the jurors in reaching their verdict. As explained in State v. Hamilton, 574 So.2d 124, 128 (Fla.1991), Section 90.607(2)(b), Florida Statutes, forbids absolutely any judicial inquiry into the emotions, mental processes, or mistaken beliefs of the jurors. This is because such matters normally inhere in the verdict itself, and the law therefore does not permit a juror to avoid his or her verdict based upon such considerations. Accord McAllister Hotel, Inc. v. Porte, 123 So.2d 339, 344 (Fla.1959).
There are, however, a number of narrow exceptions to the general rule restricting such inquiries if there exists a matter extrinsic to the verdict sufficient to justify a jury interview. As explained in Maler v. Baptist Hospital of Miami, Inc., 559 So.2d 1157, 1162 (Fla. 3d DCA 1989), approved, 579 So.2d 97 (Fla.1991):
In order to constitute juror misconduct and, therefore, a matter extrinsic to the verdict sufficient to set aside the verdict or for a post-trial jury inquiry, Florida and other courts have consistently held that some objective act must have been committed by or in the presence of the jury or a juror which compromised the integrity of the fact-finding process[.]
Such objective acts include the making by a juror of a vile racial, religious, or ethnic slur against a party or a witness during a trial or jury deliberations. Id. The Third District continued that the enumerated cases in which a post-trial jury inquiry was warranted, involved “some type of objective act or occurrence that was relatively easy to ascertain — as opposed to probing ... into the gossamer mental processes, agreements, conclusions, and reasoning of the jury.” Id.
This rule is exemplified by the facts in Sanchez v. International Park Condominium Association, 563 So.2d 197, 198 *359 (Fla. 3d DCA 1990), in which two jurors corroborated one juror’s testimony of another juror’s ethnic slur that “Cubans as a whole ... yell sue, sue, sue, or want to sue at the drop of a hat.” The Third District noted that in conducting the jury interview, the trial court concentrated on determining whether any of the jurors had been affected by the comments reflecting ethnic bias, and that all testified — similar to the testimony of the jurors in the present case— they had not been so influenced. Based upon the jurors’ responses, the trial court denied the motion for new trial. In reversing the denial and remanding the case for new trial, the Third District observed: “It may be that the other jurors * were not affected by the remarks made by juror six. Juror six was, however, an active participant in the deliberative process, and the verdict included his input.... The plaintiff was entitled to have her case heard by an impartial jury.” Id. at 199 (footnote omitted).
The evidence on remand discloses that the jurors collectively disregarded the trial court’s instructions not to prejudge the case and formed an opinion of the case based upon considerations extraneous to the issues tried, as shown by various comments made during the trial which obviously favored the defendant. The fact that juror Smith characterized juror Tuten’s statement as applying to Tuten herself rather than Singletary, as attributed by juror Lumpkin, does not, in my judgment, detract from the vile, prejudicial effect of the statement, which was clearly directed at Kathryn Singletary for having so many children, and which was made in the presence of other jurors before their deliberations.
Regardless of how Tuten’s comment was phrased, it was obviously “evidence of [an] improper consideration[ ]” in that it was a “prejudicial comment[ ] [made] in the presence of the jury.” Singletary I, 584 So.2d at 637. The statement, moreover, revealed its utterer to harbor certain negative stereotypes which demonstrated her lack of fitness to sit as a fair and impartial arbiter. As the Eleventh Circuit Court of Appeals observed in United States v. Heller, 785 F.2d 1524, 1527 (11th Cir.1986): “A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well permit him or her from making decisions based solely on the facts and law that our jury system requires.”
Consequently, when issues I and II are considered together, relating to both material concealment and the existence of a prejudicial, racial statement, I am of the view that the trial court erred in finding the nonexistence of same. The record supports the conclusion not only that Tuten deliberately concealed her acquaintance of the Singletary family, but that such concealment was made in bad faith, particularly in view of the fact that her prejudicial comments appear to have been made from the outset of the trial. The detrimental effect of a juror’s false concealment of a material fact on a party’s right to a fair trial was well analyzed by Justice Cardozo in Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), in the following terms:
The petitioner [the juror] is not condemned for concealment, though concealment has been proved. She is not condemned for false swearing, though false swearing has been proved. She is condemned for that she made use of false swearing and concealment as the means whereby to accomplish her acceptance as a juror, and under cover of that relation to obstruct the course of justice. There is a distinction not to be ignored between deceit by a witness and deceit by a tales-man. A talesman when accepted as a juror becomes a part or member of the court. The judge who examines on the voir dire is engaged in the process of organizing the court. If the answers to the questions are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham. What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. If a kins *360 man of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different. The doom of mere sterility was on the trial from the beginning.
Id. at 11, 53 S.Ct. at 468, 77 L.Ed. at 998 (citations omitted).
Moreover, the participation of a biased, prejudiced juror in the verdict contaminates the entire trial proceedings, and the misconduct of one juror becomes the misconduct of all. See Thomas v. Kansas Power & Light Co., 185 Kan. 6, 340 P.2d 379, 385 (1959) (“[A] jury when accepted becomes a part of the court, and must necessarily act as a unit, and the misconduct of any juror which is sufficient to compel the granting of a new trial is misconduct of the entire jury.”)
The majority in the present case correctly observes that a motion for new trial should not be granted, notwithstanding the presence of misconduct, if the party opposing the motion for new trial is able to demonstrate that there is no reasonable possibility that such misconduct affected the verdict. See Baptist Hospital of Miami, Inc. v. Maler, 579 So.2d 97, 100 n. 1 (Fla.1991). As the majority explains, the trial court never decided whether the misconduct alleged affected the jurors’ verdict because the court found no misconduct occurred, a finding which the majority affirms.
If, as I consider, the trial court erred in its finding of no misconduct, I see no further need to remand on the issue of whether there was any reasonable possibility that the jurors’ misconduct affected the verdict returned. Once misconduct is established, I think, as applied to the facts of this case, it would be impossible for any court to conclude that there was no reasonable possibility that the prejudicial comments did not affect the verdict. The issues of liability were hotly contested, and there was clearly sufficient evidence from which an unbiased jury could have returned a verdict in plaintiffs’ favor. Three experts testified on behalf of plaintiffs that Kathryn Single-tary’s prior medical history indicated a high-risk pregnancy, and that defendant, who did not perform Caesarian sections, should have earlier referred Singletary for adequate medical assistance once she learned of the problems associated with Singletary’s prior pregnancies. I therefore conclude that reversal of the judgment and remand of the case for new trial are clearly required.
Although I would so decide, I now have serious reservations whether Ms. Single-tary and her son can receive a fair trial in Hamilton County. In its denial of the motion for new trial, the trial court made the following statements:
I don’t find the evidence here to support any misconduct on the part of the jury, and I’d comment that this jury probably has less misconduct than 95 percent of them, as far as what they set around and talked about, basically considering this thing went on for a week and a half, I believe, and I’m really proud they did as well as they did, and the jury’s apparently followed instructions as well as they did, and I’ll find that there’s no misconduct on the part of the jury and will deny the motion for new trial.
If the above comments by the trial court are an accurate description of the conduct of trials generally afforded parties in Hamilton County, involving situations, such as that at bar, in which jurors cavalierly disregard the trial judges’ instructions not to discuss the case among themselves, or to form or express any opinion before they begin their deliberations, and if 95 percent of the trials so conducted do not conform to the standard of fairness exemplified in Ms. Singletary’s case, I regard appellant’s arguments for change of venue to have substantial merit. Nevertheless, this is an issue which was raised and decided adversely to appellant in Singletary I. The law of the case as established in this court’s former decision now precludes relitigation of this issue. I would, nonetheless, reverse and remand the case for new trial without prejudice to appellants’ right to renew their motion for change of venue as to events transpiring after the trial of the cause *361 which may impact upon plaintiffs’ right to a fair and impartial trial by jury.

. Because of my proposed disposition, it is unnecessary to discuss the appellate cost issue.

. Kathryn Singletary had four children before Ellis was born.

. Compare the facts in the above case with those in Sanchez v. International Park Condominium Association, 563 So.2d 197 (Fla. 3d DCA 1990), in which one juror’s report of juror misconduct in the form of ethnic slurs was corroborated by two other jurors; two jurors did not remember the comments; and the juror identified as making the comments denied making or hearing them. On this evidence the Third District reversed the trial court’s denial of the motion for new trial and remanded the case for new trial.