652 So.2d 354 (1995)
Derrick A. POWELL and Eugenia Powell, Petitioners,
v.
ALLSTATE INSURANCE COMPANY, a Foreign Corporation, Respondent.
No. 83625.
Supreme Court of Florida.
January 19, 1995.
Rehearing Denied April 7, 1995.
*355 Robert C. Gray of Alpizar & Gray, P.A., Palm Bay, for petitioners.
Donna C. Wyatt and Laura P. Kowalczyk of Beers, Jack, Tudhope & Wyatt, P.A., Maitland, and Sharon Lee Stedman of Sharon Lee Stedman, P.A., Orlando, for respondent.
Roy D. Wasson and Sally M. Richardson, Miami, Marisa Tinkler Mendez and Barbara Green, Coral Gables, amici curiae for Academy of Florida Trial Lawyers and Florida Ass'n for Women Lawyers.
Richard J. Ovelmen and Edward Soto of Baker & McKenzie, Miami, amicus curiae for The American Civil Liberties Union Foundation of Florida, Inc.
ANSTEAD, Justice.
We have for review Powell v. Allstate Insurance Co., 634 So.2d 787 (Fla. 5th DCA 1994), because it conflicts with Sanchez v. International Park Condominium Ass'n., Inc., 563 So.2d 197 (Fla. 3d DCA 1990), and Baptist Hospital, Inc. v. Maler, 579 So.2d 97 (Fla. 1991). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const. We quash Powell.

MATERIAL FACTS
This case arose from an automobile collision between the Powells and another motorist (tortfeasor), in which Mr. Powell was injured. Allstate Insurance Company (Allstate) insured the Powells with underinsured motorist coverage. After recovering the liability insurance policy limits of $10,000 from the tortfeasor, the Powells brought an action against their own underinsured motorist coverage carrier, Allstate, seeking to recover their remaining damages which they claimed to exceed $200,000.
Following a jury trial, Mr. Powell was awarded $29,320 in damages and Mrs. Powell nothing. The next day one of the jurors, Karen Dowding (Dowding), contacted both the Powells' attorney and the trial judge to inform them that other members of the jury had made numerous racial jokes and statements about the Powells throughout the trial proceedings and during jury deliberations. Mr. and Mrs. Powell are black citizens of Jamaican birth. All of the jurors are white.[1]
Based upon this disclosure, the Powells requested a new trial or, alternatively, an interview of the entire jury panel. The trial court held an in-court interview of Dowding, which was attended by both parties' attorneys. Dowding testified that various jurors made racial remarks and jokes and she believed the verdict was the result of racial bias.[2] The trial court denied both motions. *356 On appeal, the Fifth District initially reversed and directed that further juror interviews be conducted, and if the trial court concluded that racial statements were made that a new trial be ordered. Powell v. Allstate Ins. Co., 18 Fla. L. Weekly D 2398 (Fla. 5th DCA Nov. 12, 1993). On rehearing, in a five-to-four decision, the Fifth District reversed itself and affirmed the trial court's decision on the authority of Baptist Hospital, Inc. v. Maler, 579 So.2d 97 (Fla. 1991). Powell, 634 So.2d at 789.

Discussion
The authority of a trial court to grant a new trial derives in part from the equitable principle that neither a wronged litigant nor society itself should be without a means to remedy a palpable miscarriage of justice. Ford v. Robinson, 403 So.2d 1379 (Fla. 4th DCA 1981). The issue of whether juror misconduct may serve as a basis for ordering a new trial has been visited by this Court and our appellate courts in a wide variety of cases.
In State v. Hamilton, 574 So.2d 124 (Fla. 1991), we adopted the test used by the Fifth Circuit in Rodriguez Y. Paz v. United States, 473 F.2d 662, 663-64 (5th Cir.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 52 (1973), and United States v. Howard, 506 F.2d 865, 869 (5th Cir.1975), which limits the trial court's inquiry in jury misconduct cases to
objective demonstration of extrinsic factual matter disclosed in the jury room. Having determined the precise quality of the jury breach, if any, the [trial] court must then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant... . Though a judge lacks even the insight of a psychiatrist, he must reach a judgment concerning the subjective effects of objective facts without benefit of couch-interview introspections. In this determination, prejudice will be assumed in the form of a rebuttable presumption, and the burden is on the Government to demonstrate the harmlessness of any breach to the defendant.
Hamilton, 574 So.2d at 129 (quoting United States v. Howard, 506 F.2d at 869 (alteration in original)).[3] In applying this test, courts must take into account Florida's Evidence Code which forbids any judicial inquiry into the emotions, mental processes, or mistaken beliefs of jurors. § 90.607(2)(b), Fla. Stat. (1993). In relevant part, this section states as follows:
Upon an inquiry into the validity of a verdict or indictment, a juror is not competent to testify as to any matter which essentially inheres in the verdict or indictment.
Notwithstanding this evidentiary rule,[4] we have permitted jurors to testify about "`overt acts which might have prejudicially affected the jury in reaching their own verdict.'" Hamilton, 574 So.2d at 128 (quoting Law Revision Council Note (1976), 6C Fla. Stat. Ann. 57 (1979) (alteration in original)).
In Maler, we reaffirmed our holding in Hamilton but acknowledged that in light of the strong public policy against going behind a verdict to determine if juror misconduct has occurred, "an inquiry is never permissible unless the moving party has made sworn factual allegations that, if true, would require a trial court to order a new trial using the standard adopted in Hamilton." Id. at 100. In Maler, we stated:

*357 Similarly, any receipt by jurors of prejudicial nonrecord information constitutes an overt act. Accordingly, it is subject to judicial inquiry even though that inquiry may not be expanded to ask jurors whether they actually relied upon the nonrecord information in reaching their verdict. Hamilton. As Judge Hubbart correctly suggested in the opinion under review, the case law on this topic allows inquiry only into objective acts committed by or in the presence of the jury or a juror that might have compromised the integrity of the fact-finding process. Maler, 559 So.2d at 1162 (citing Russ [v. State, 95 So.2d 594 (Fla. 1957)]; Marks [v. State Road Dept., 69 So.2d 771 (Fla. 1954)]; accord Hamilton.

Id. at 101.[5]
Under this test:
"[T]he moving party first must establish actual juror misconduct in the juror interview. Once this is done, the party making the motion is entitled to a new trial unless the opposing party can demonstrate that there is no reasonable possibility that the juror misconduct affected the verdict. Hamilton, 574 So.2d at 129 (quoting Rodriguez Y. Paz v. United States, 462 F.2d 740, 745 (5th Cir.1972)).
Maler, 579 So.2d at 100 n. 1. Justice Kogan accurately summarized this point in his separate opinion in Maler:
In reaching this conclusion, I do not disagree with the majority's distinction between overt acts (which can be the subject of an interview) and subjective thought processes (which cannot). Clearly, Hamilton and all the case law upon which it relied have adhered to this distinction.
Id. at 101 (Kogan, J., concurring in part and dissenting in part).
In the original panel opinion of the Fifth District, and in Sanchez,[6] the courts held that explicit statements of racial or ethnic bias made by jurors concerning the litigants in the case constituted juror misconduct requiring a new trial. At issue is whether such comments fall into the category of overt juror misconduct which may be the subject of inquiry after a verdict is returned, or whether such conduct "inheres in the verdict" as a "matter resting alone in the juror's breast."
In the instant case, we find the alleged racial statements made by some of the jurors to constitute sufficient "overt acts" to permit trial court inquiry and action. Under Maler and Hamilton, it would be improper, after a verdict is rendered, to individually inquire into the thought processes of a juror to seek to discover some bias in the juror's mind, like the racial bias involved here, as a possible motivation for that particular juror to act as she did. Those innermost thoughts, good and bad, truly inhere in the verdict.
But when appeals to racial bias are made openly among the jurors, they constitute overt acts of misconduct. This is one way that we attempt to draw a bright line. This line may not keep improper bias from being a silent factor with a particular juror, but, hopefully, it will act as a check on such bias *358 and prevent the bias from being expressed so as to overtly influence others.
We also find the conduct alleged herein, if established, to be violative of the guarantees of both the federal and state constitutions which ensures all litigants a fair and impartial jury and equal protection of the law. U.S. Const. amends. VII, XIV, § 1; Art. I, § 22, Fla. Const.[7]
The issue of racial, ethnic, and religious bias in the courts is not simply a matter of "political correctness" to be brushed aside by a thick-skinned judiciary. Rather, we agree with Judge Tuttle's opinion in United States v. Heller, 785 F.2d 1524 (11th Cir.1986), regarding this issue:
Despite longstanding and continual efforts, both by legislative enactments and by judicial decisions to purge our society of the scourge of racial and religious prejudice, both racism and anti-Semitism remain ugly malignancies sapping the strength of our body politic. The judiciary, as an institution given a constitutional mandate to ensure equality and fairness in the affairs of our country when called on to act in litigated cases, must remain ever vigilant in its responsibility. The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require. A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires. The religious prejudice displayed by the jurors in the case presently before us is so shocking to the conscience and potentially so damaging to public confidence in the equity of our system of justice, that we must act decisively to correct any possible harmful effects on this appellant.
785 F.2d at 1527. We can hardly improve on this commentary.
The founding principle upon which this nation was established is that all persons were initially created equal and are entitled to have their individual human dignity respected. This guarantee of equal treatment has been carried forward in explicit provisions of our federal and state constitutions. It is not by chance that the words "Equal Justice Under Law" have been placed for all to see above the entrance to this nation's highest court. If we are to expect our citizens to treat one another with equal dignity and respect, the justice system must serve as the great example of maintaining that standard. And while we have been far from perfect in implementing this founding principle, our initial declaration and our imperfect struggle and efforts have served as a beacon for people around the world.
It is with great dismay then that we must acknowledge, more than two hundred years after declaring this truth to the world, that there are still those among us who would deny equal human dignity to their brothers and sisters of a different color, religion, or ethnic origin. The justice system, and the courts especially, must jealously guard our sacred trust to assure equal treatment before the law. We attempt to uphold that trust today.
Accordingly, we approve the Sanchez opinion and quash the Fifth District's decision and remand with instructions for the trial court to conduct an appropriate hearing to ascertain whether racial statements were made as asserted. If the trial court determines that such statements were made, it shall order a new trial.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING and WELLS, JJ., concur.
NOTES
[1] The jurors were questioned during voir dire as to whether they could give the Powells, as Jamaican natives, a fair trial and they agreed they could.
[2] The original panel opinion of the Fifth District summarized Dowding's testimony:

The trial judge held an in-court interview of Dowding, attended by attorneys for both parties. It was transcribed and is part of the record on appeal. Dowding testified that various jurors had made a number of racial jokes and statements to each other during the trial. They laughed and participated in the jokes, although when challenged by her in the jury room, they denied they meant anything by their "jokes," or that they were, in fact, prejudiced against Powell because of his race.
For example, Dowding testified that the juror, who was later elected to be foreman of the jury, told an old "saw" of a joke: "There's a saying in North Carolina, hit a nigger and get ten points, hit him when he's moving, get fifteen." The alternate female juror supposed that because the Powells had their grandchildren living with them, their children were "probably drug dealers. And, everybody was like, yeah, yeah. And they were laughing." Two men on the jury laughed about Johnson's [a witness and friend of the Powells] testimony at the trial. They pointed to the book Dowding was carrying (Through A Window by Jane Goodall) which had a picture of chimpanzees on the cover, and made some sort of reference to Johnson. One said: "[a]nd Mr. Johnson got out of the car and laid down on the pavement." They went into hysterics.
Another juror, who had worked for IBM, told the others that the turnover rate for black employees with the company was twenty-five percent but only two percent for whites. He concluded blacks "didn't work for us as well." Powell's loss of wages and earning power were issues in this case. Another concluded Powell "just wants to retire."
Powell v. Allstate Ins. Co., 18 Fla.Weekly D2398, D2398-99 (Fla. 5th DCA Nov. 12, 1993), withdrawn, 634 So.2d 787 (Fla. 5th DCA 1994).
[3] We first announced this rule in McAllister Hotel, Inc. v. Porte, where we said:

[T]he law does not permit a juror to avoid his verdict for any reason which essentially inheres in the verdict itself, as that he "did not assent to the verdict; that he misunderstood the instructions of the Court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast."
123 So.2d 339, 344 (Fla. 1959) (quoting Wright v. Illinois & Mississippi Telegraph Co., 20 Iowa 195, 210 (1866)).
[4] Numerous public policy reasons have been advanced for this rule: (1) "litigation will be extended needlessly if the motives of jurors are subject to challenge," Maler, 579 So.2d at 99; (2) "`preventing litigants or the public from invading the privacy of the jury room,'" id. (quoting Velsor v. Allstate Ins. Co., 329 So.2d 391, 393 (Fla. 2d DCA), cert. dismissed, 336 So.2d 1179 (Fla. 1976)); (3) shielding jurors from harassment by lawyers; and (4) finality of verdicts.
[5] Judge Hubbart, writing for the Third District in Maler, explained:

In each of these cases, the integrity of the fact-finding process was compromised by some objective occurrence so as to "taint" the jury's deliberations, viz: third party contact or conversations about the case with or in the presence of a juror, Russ; Marks; total abandonment of any deliberative process as when the jury decides the case by quotient, lot or chance, Marks; a disqualifying act of a juror which brings the latter's fairness into serious question, as when the juror lies about a material matter during jury selection, Sconyers [v. State, 513 So.2d 1113 (Fla.2d DCA 1987)], or expresses vile racial, religious or ethnic slurs about a party or witness, [United States v. Heller [785 F.2d 1524 (11th Cir.1986)]; or jury exposure to alleged facts about the case which were never introduced in evidence, as when a juror gives personal testimony in the jury room about the case, Russ, or visits a relevant scene in the case and reports his findings to the jury, [United States v. Posner [644 F. Supp. 885 (S.D.Fla. 1986)]. Moreover, these cases all center around some type of objective act or occurrence that was relatively easy to ascertain  as opposed to probing, as here, into the gossamer mental processes, agreements, conclusions, and reasoning of the jury.
Maler v. Baptist Hospital, 559 So.2d 1157, 1162 (Fla. 3d DCA 1989), approved, 579 So.2d 97 (Fla. 1991).
[6] Sanchez involved a claim of bias against persons of Cuban birth or heritage.
[7] See City of Miami v. Cornett, 463 So.2d 399 (Fla. 3d DCA) (upholding right to an impartial jury in a civil case), cause dismissed, 469 So.2d 748 (Fla. 1985).